**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Margaret White,<br><br>         Plaintiff,<br><br>v.<br><br>Commissioner of Social Security Administration,<br><br>         Defendant. | No. CV-23-00775-PHX-GMS<br><br>**ORDER** |

Plaintiff Margaret White,[1] on behalf of the decedent, Mariah Ruth White, seeks review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security ("the Commissioner"), which denied her child's insurance benefits based on disability and supplemental security income under 42 U.S.C §§ 416(i), 423(d), and 1382c(a)(3)(A) of the Social Security Act, 42 U.S.C. §§ 301-2113. Because the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence, the Court remands the Commissioner's decision to the ALJ for the calculation and award of benefits.

**I.      BACKGROUND**

Mariah White ("Claimant") was born September 1995. (Doc. 8-3 at 40). She had the following severe impairments: Arnold Chiari syndrome status post decompression, degenerative disc disease, asthma, tachycardia, headaches, and small fiber neuropathy.

---

[1] Mariah White is the Claimant for social security benefits, and Plaintiff Margaret White is Mariah White's mother.

(Doc. 8-3 at 41). Claimant had a limited education. (Doc. 8-3 at 47). She had no past relevant work experience. (*Id.*).

On November 30, 2015, Mariah Ruth White ("Claimant") applied for child's insurance benefits (Title II benefits) based on disability. She also filed a Title XVI application for supplemental security income on June 30, 2020. In both applications, Claimant alleged disability beginning April 1, 2015. The Title II application was denied initially on March 6, 2020, and upon reconsideration on June 30, 2020. Claimant filed a written request for a hearing, received on July 7, 2020. The Title XVI application was escalated to the hearing level. On November 10, 2021, Claimant appeared with her attorney and testified at a video hearing before the ALJ. A vocational expert also testified. (Doc. 8-3 at 38). On December 10, 2021, the ALJ issued a decision that, based on the November 30, 2015 application for child's insurance benefits, Claimant was not disabled within the meaning of the Social Security Act prior to September 15, 2017, the date she attained age 22. Pursuant to the application for supplemental security income protectively filed on June 30, 2020, the ALJ determined that the Claimant was not disabled. (Doc. 8-3 at 49).

Claimant requested review of the ALJ's decision by the Appeals Council. On November 7, 2022, the Appeals Council was notified of Claimant's death that occurred on October 28, 2022. Social Security Administration regulations 20 C.F.R. 404.971(b) and 416.1471(b) provide that the Appeals Council may dismiss a request for review where the claimant dies and the dismissal will not adversely affect a survivor or other qualified person. The Appeals Council dismissed the request for review on January 6, 2023. (Doc. 8-3 at 16-17). The Appeals Council received a Notice Regarding Substitution of Party Upon Death of Claimant dated December 21, 2022. (Doc. 8-3 at 19). On March 6, 2023, the Appeals Council issued a notice stating, "Under 20 CFR 404.503(b) and 416.542(b), the claimant's mother Margaret White [Plaintiff] is a qualified substitute party for the Title II claim but not for the Title XVI claim. As a result, we are vacating the prior dismissal for the Title II claim but the prior dismissal for the Title XVI claim will remain in effect."

(Doc. 8-3 at 2).[2] The January 6, 2023 decision was set aside, and the Appeals Council considered additional information regarding the Title II claim. The Appeals Council then denied Claimant's request for review of the hearing decision, adopting the ALJ's decision as the Commissioner's final decision. (Doc. 8-3 at 2). On May 5, 2023, Plaintiff sought review by this Court. (Doc. 1).

## II.  STANDARD OF REVIEW

The district court reviews only those issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). Claims that are not actually argued in an appellant's opening brief are not considered on appeal. *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). "[O]nly issues [that] are argued specifically and distinctly in a party's opening brief" are reviewed. *Id.* (internal quotation marks omitted). Moreover, "when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal." *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999). The court will excuse the failure to do so only when necessary to avoid a manifest injustice. *Id.*

A court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or contains legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Id.* (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n. 1 (9th Cir. 2005)). The court, taking as relevant all evidence that a "reasonable person might accept as adequate to support a conclusion," considers the record as a whole. *Id.* (quoting *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)). In determining whether substantial evidence supports a decision, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Id.* (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir.2006)). Generally, when the evidence is susceptible to more than one rational interpretation, the court "must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the

---

[2] This is not disputed by the Claimant, so the only claim at issue here is the Title II claim.

record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). "Overall, the standard of review is 'highly deferential.'" *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1002 (9th Cir. 2015) (quoting *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009)).

Harmless error principles apply in the Social Security Act context. *Molina*, 674 F.3d at 1115. An error is harmless if substantial evidence remains to support the ALJ's decision, and the error does not affect the ALJ's ultimate determination. *Id.* The claimant usually bears the burden of proving that an error is harmful. *Id.* at 1111.

## III.   FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).[3]

At step one, the ALJ found that Claimant was born September 1995 and had not attained age 22 as of April 1, 2015, the alleged onset date per the requirements of the Social Security Act. She had not engaged in substantial gainful activity since April 1, 2015, the alleged onset date. At step two, the ALJ found that Claimant had the following severe impairments: Arnold Chiari syndrome status post decompression, degenerative disc disease, asthma, tachycardia, headaches, and small fiber neuropathy. At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments

---

[3] At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id*. At step two, the ALJ determines whether the claimant has a severe medically determinable physical or mental impairment. § 404.1520(a)(4)(ii). If not, the claimant is not disabled, and the inquiry ends. *Id*. At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id*. If not, the ALJ proceeds to step four. *See id*. At step four, the ALJ assesses the claimant's residual functional capacity and determines whether the claimant is still capable of performing past relevant work. § 404.1520(a)(4)(iv). If so, the claimant is not disabled, and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where she determines whether the claimant can perform any other work based on the claimant's residual functional capacity, age, education, and work experience. § 404.1520(a)(4)(v). If the plaintiff can perform any other work, the claimant is not disabled. *Id.* If not, the claimant is disabled. *Id.*

that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  At step four, the ALJ found, after careful consideration, that Claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a), but Claimant could not climb ladders, ropes, or scaffolds; could not balance as defined in the Dictionary of Occupational Titles (DOT); could occasionally climb ramps or stairs; and could frequently stoop.  Additionally, the ALJ found that the claimant could withstand occasional exposure to excessive loud noise; occasional concentrated exposure to pulmonary irritants (such as fumes, odors, dust, and gases); occasional concentrated exposure to poorly ventilated areas; no exposure to dangerous moving machinery or unprotected heights; and no occupational driving.  The ALJ noted that Claimant had no past relevant work.  She was born in September 1995 and was 19 years old, which is defined as a "younger individual age 18-44," on the alleged disability onset date.  Claimant had a limited education.  The ALJ did not consider the transferability of job skills because Claimant did not have past relevant work.  At step five, the ALJ concluded that, considering Claimant's age, education, work experience, and residual functional capacity, Claimant could have performed a significant number of jobs in the national economy.  (Doc. 8-3 at 40-48).

Thus, Claimant was neither entitled to child's insurance benefits, as defined in section 223(d) of the Social Security Act, nor was she entitled to supplemental security income under section 1614(a)(3)(A) of the Act.  On behalf of the deceased Claimant, Plaintiff Margaret White seeks review of the ALJ's decision.  (Doc. 8-3 at 19).

**IV. ANALYSIS**

Plaintiff alleges that the ALJ committed a materially harmful error by rejecting the assessments from Claimant's treating physicians, Jose De Ocampo, M.D. (neurologist), David Saperstein, M.D. (neurologist), Ryan Casper, M.D. (allergist), and Carlton Richie, D.O. (primary care), without specific and legitimate reasons based on substantial evidence in the record as a whole.  (Doc. 12 at 1).

**A.     The ALJ Erred in Weighing Medical Source Opinion Evidence.**

**1.     Legal Standard**

Under the pre-2017 regulations that apply to Plaintiff's claim[4], "more weight should be given to the opinion of a treating [physician] than to the opinion[s of physicians] who do not treat the claimant." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). The weight afforded to a non-examining physician's opinion depends on the extent to which he provides supporting explanations for his opinions. *Id.* Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing reasons supported by substantial evidence in the record." *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Where a treating physician's opinion is contradicted by another physician, it may be rejected only for "specific and legitimate reasons supported by substantial evidence in the record." *Id.*

**2.     Discussion**

The record shows the ALJ failed to provide specific and legitimate reasons, supported by substantial evidence, for giving little weight to the medical opinions of Claimant's treating physicians, Drs. De Ocampo, Saperstein, Richie[5], and Casper. The ALJ relied on similar justifications for all four doctors. The Court will address those justifications below. While not all of the ALJ's justifications were unsupported by specific and legitimate evidence, the ALJ's overall conclusions to afford the doctors' opinions little weight was prejudicial error.

**a.     ALJ Erred in Determining Doctors Overly Relied on Claimant's Subjective Complaints.**

The ALJ may discount a physician's opinion that is based only on the claimant's subjective complaints and lacks objective evidence. *Batson v. Comm'r of Soc. Sec. Admin.*,

---

[4] Because Plaintiff filed her Title II application prior to March 27, 2017, the prior medical opinion regulations apply. 20 C.F.R. §404.1527.
[5] The Commissioner in his briefing and the ALJ in her decision often erroneously refer to Dr. Ritchie as Dr. Carlton. Dr. Ritchie's full name is Dr. Cartlon Ritchie.

359 F.3d 1190, 1195 (9th Cir. 2004). The opinion of any physician, including that of a treating physician, need not be accepted "if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)). An ALJ may consider, when evaluating any medical opinion, "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion." *Orn*, 495 F.3d at 631.

Here, the ALJ erred in determining that all four, treating physicians—Drs. De Ocampo, Saperstein, Richie, and Casper—overly relied on Claimant's subjective complaints, because the ALJ did not adequately consider the consistency of the doctors' considerations with Claimant's medical record as a whole.

For example, the ALJ gave little weight to Dr. Richie's opinions, in part, because the ALJ found Dr. Richie's reliance on a postural orthostatic tachycardia syndrome (POTS) diagnosis of Claimant to be unsupported by the evidence. (Doc. 8-3 at 46). This same justification was provided as a reason to discount Dr. De Campo's opinions. (*Id.*). However, neither Dr. Richie's nor Dr. De Campo's reliance on a POTS diagnosis was unfounded. Plaintiff, in her brief, points to several instances in Claimant's complex medical history that support the Doctors' reliance on a POTS diagnosis in their evaluations of Claimant's physical abilities. *E.g.*, (Doc. 9-3 at 32) (Dr. Goodman, M.D., neurologist at Mayo, noted symptoms "compatible with [POTS]"); (Doc. 9-5 at 20-24) (Jamie Potter, FNP-C, neurology at Mayo, noted Claimant's past medical history as significant for POTS and included POTS in her assessment and plan of treatment); (Doc. 9-2 at 19) (Claimant referred to Dr. Goodman, M.D., with a diagnoses of [POTS]). Further, the ALJ made only one evidentiary finding from Claimant's entire medical record to support her assertion that the POTS diagnosis was not a "medically determinable impairment." (Doc. 8-3 at 46). This finding resulted from a tilt table test—a test used to diagnose POTS—which the evaluating doctor stated was "suggestive of [POTS], but can be seen in other conditions or states that have the potential to reduce orthostatic tolerance." (Doc. 9-3 at 56-57). Given

this evidence, the ALJ's finding that a POTS diagnosis was only based on "claimant's subjective report" was unfounded. (Doc. 8-3 at 46).

Similar to the ALJ's justification for giving little weight to the opinions of Drs. Ritchie and De Campo, the ALJ wrote that Dr. Caspar's opinion "appears to rely heavily on the claimant's subjective complaints that have not been established by the objective evidence, including a diagnosis of POTS." (*Id.*). Yet, for the reasons stated above, there is sufficient objective evidence to support a diagnosis of POTS that is not sufficiently rebutted and, in fact, is to some degree supported by the tilt table test which "was suggestive of POTS," but which the ALJ nevertheless offered as the basis for rejecting the treating doctor's opinion. The ALJ further argues that Dr. Caspar "relied on a speculative diagnosis," which offers more reason to discount his opinion. (*Id.*). However, the ALJ misrepresented Dr. Caspar's analysis. In fact, Dr. Casper listed the following as patient's medically determinable impairments: POTS, food sensitivities, asthma, allergic rhinitis, and "possible hereditary alpha trypasemia." (Doc. 9-9 at 167). Including one "possible" impairment in a long list of other certain impairments does not undermine Dr. Casper's conclusions, as the ALJ suggests.

Finally, the ALJ stated that Dr. Saperstein's opinions should be given little weight, in part, because Dr. Saperstein, "in making his conclusions . . . relied, in large part, on alleged conditions that have not been established as medically determinable impairments (Ehlers-Danlos, CSF leak, mast cell activation syndrome)." (Doc 8-3 at 46). The ALJ did not provide substantial evidence to support this finding. For example, the only evidence the ALJ provided to support her assertion that Dr. Saperstein should not have relied on Claimant having Ehlers-Danlos (EDS) is a citation to a note in Dr. Saperstein's intake form for Claimant's initial appointment in which he wrote, "[d]iagnosed with EDS at age 19 by rheumatology." (Doc. 8-3 at 42; Doc. 8-10 at 4). The ALJ stated that, because no diagnosis by the rheumatologist existed in the record, no objective evidence supports the condition. (Doc. 8-3 at 42). Yet, Dr. Saperstein wrote in his assessment of Claimant that her history and examination suggested EDS. (Doc. 8-10 at 18). He even noted that Claimant "misses formal criteria for hypermobile EDS by only 1 point" and that "some features have not

been detected via telemedicine assessment." (Doc 8-10 at 18). In Dr. Saperstein's follow up assessment of Claimant, over a year later, Dr. Saperstein wrote that "MRIs show craniovervical [sic] instability (CCI) and these can be cause for all of these issues. CCI often develops after Chiari decompression in patients with EDS." (Doc. 9-10 at 14). This evidence demonstrates that Dr. Saperstein did not rely primarily on Claimant's subjective complaints, nor her intake narrative that she was previously diagnosed by rheumatology, when making his determination about White's abilities. Instead, he relied on objective evidence in making his diagnosis. In its Response, the Commissioner unconvincingly argues that, rather than a rejection of the EDS diagnosis, the ALJ's determination was that EDS was not a medically determinable impairment. That is not, however, what the ALJ said. "Although the claimant alleges Ehlers-Danlos syndrome, there is no objective evidence to support this condition." (Doc. 8-3 at 42). Even if it was, there is no distinguishable difference between a diagnosis and a medically determinable impairment when the treating physician determined that the claimant had EDS and the ALJ rejected that opinion without a sufficient basis for doing so. It is further worth noting that the ALJ did not include EDS as even causing a non-severe impairment in her decision. (*Id.* at 40).

Thus, considering the record as a whole, this finding by the ALJ lacked substantial evidence. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). All other things being equal, because Dr. Saperstein works for the Center for Complex Neurology, EDS & POTS, the ALJ should have given more, not less, weight to his opinion. (Doc. 12 at 9); *see id.* at § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty.").

The ALJ is not a physician, and she cannot substitute her opinion for a medical professional. *Brennan-Kenyon v. Barnhart,* 252 F.Supp.2d 681, 691 (N.D. Ill. 2003) (holding that "[i]t is established in Social Security law that an ALJ may not play doctor and substitute h[er] own opinion for that of a physician, or make judgments that are not sustained by objective medical evidence.") The reasons the ALJ provided for rejecting the

opinions of Claimant's treating physicians are insufficient—neither "clear and convincing," nor supported by "substantial evidence in the record." *See Orn*, 495 F.3d at 632. In fact, the record as a whole contradicts the ALJ's assertion that the Doctors relied only on claimant's subjective reports of underlying conditions, or speculative diagnoses, unsupported by objective evidence or medical determinations. The ALJ thus erred in rejecting the opinions of Drs. De Ocampo, Saperstein, Richie, and Casper on these grounds.

        **b.    The ALJ Erred in Determining the Physical Limitations Cited by Doctors were Extreme and Inconsistent with the Medical Record.**

All four treating physicians, in their medical assessments of Claimant's ability to do work-related physical activities, concluded that Claimant had "impairments that preclude an 8-hour workday," based on "objective, clinical, or diagnostic findings . . . documented, either by [the treating doctor], or elsewhere in the patient's medical records." (Doc. 9-8 at 113-16; Doc. 9-4 at 67-68; Doc. 8-10 at 36-37; Doc. 8-9 at 80-81; Doc. 9-9 at 167-68). While the assessments were all check-the-box forms, medical records demonstrate that all four physicians were aware of White's medical history and were involved in treating her symptoms. Yet, the ALJ discredited the opinions of Drs. Carlton, Caspar, and De Campo regarding White's physical limitations because the findings were "extreme and inconsistent with the medical record." (Doc. 8-3 at 46). The ALJ erred.

Under the pre-2017 regulations that apply to the present claim, the Ninth Circuit distinguishes among three types of physicians when weighing medical source opinions in Social Security cases: (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), *superseded on other grounds by regulation*, 20 C.F.R. parts 404 & 416. The Commissioner must give weight to the treating physician's subjective judgments, in addition to his clinical findings and interpretation of test results. *Id.* at 832-33. As stated above, where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons, and where

it is contradicted, it may not be rejected without "specific and legitimate reasons," supported by substantial evidence in the record. *Id.* at 830; *Orn*, 495 F.3d at 633 (explaining where there is a conflict between the opinion of a treating physician and an examining physician, the ALJ may not reject the opinion of the treating physician without setting forth specific, legitimate reasons supported by substantial evidence in the record).

This Court will address the ALJ's weighing of treating physician medical opinions, in turn, below.

      **(i)**    **Dr. Richie's Medical Assessment Was Not Extreme and Inconsistent with the Record and Should Not Have Been Rejected by the ALJ.**

The ALJ provided only one explanation to support her finding that Dr. Richie's evaluation of Claimant's physical limitations was "extreme and inconsistent with the medical record." (Doc. 8-3 at 46). She wrote, "the evidence suggests the doctor overly relied on the [C]laimant's subjective complaints, including her contention that she could not work," and she provided the Doctor's reliance on a POTS diagnosis as an example of one of Claimant's subjective complaints. (*Id.*). However, as discussed above, the ALJ did not provide substantial evidence to support a finding that Claimant's POTS diagnosis was unfounded. Further, while the Court agrees with the ALJ that Dr. Richie considered Claimant's contention that she could not work, (Doc. 9-9 at 2), the ALJ provides no specific, legitimate reasons, supported by substantial evidence, to justify her claim that Dr. Richie overly relied on this contention. *See Orn*, 495 F.3d at 632. Dr. Richie's notes consider Claimant's contention that she could not work given her other underlying diagnoses. (Doc. 8-3 at 46). For these reasons, the ALJ erred in not giving weight to treating physician, Dr. Richie's, subjective judgements, as the ALJ neither provided contradictory opinions nor "clear and convincing" reasons to reject. *See Lester v. Chater*, 81 F.3d at 830.

      **(ii) Dr. Caspar's Medical Assessment Was Not Extreme and Inconsistent with Objective Evidence and Should Not Have Been Rejected by the ALJ.**

  The ALJ did not provide doctor-specific reasoning for discounting the opinion of Dr. Casper. (Doc. 8-3 at 46). Instead, the ALJ simply wrote that Dr. Casper's medical assessments were "inconsistent with the objective evidence noted above," referring to her own evaluation of Claimant's medical record, detailed earlier in the ALJ Decision. (Doc. 8-3 at 46).

  The ALJ did, however, conduct a thorough evaluation of Claimant's medical record, specifically related to physically disabling symptoms. At the start, the ALJ noted that "the evidence supports a finding that the [C]laimant [was] limited to sedentary exertion," based on her Chiari decompression and laminectomy, degenerative disc disease, and small fiber neuropathy. (Doc. 8-3 at 44). However, the ALJ's further evaluation of the medical record does not provide "clear and convincing" reasons to reject the opinion of Dr. Caspar. The ALJ focused her analysis on two categories of evidence: (1) neurological findings and (2) orthopedic examinations and observations of White's gait. (Doc. 8-3 at 44).

  First, the ALJ cites to the diagnostic results and medical assessment of Banner neurosurgeon, Dr. Peter Nakaji. (Doc. 8-3 at 44; Doc. 9-8 at 132-133). As the ALJ correctly wrote, the neurosurgeon, in reference to Claimant's MRI brain/C-spine results, stated that there was "[n]othing particularly abnormal appreciated to explain her symptoms." (Doc. 9-8 at 132). The ALJ also highlighted the results of the neurological examination, writing that muscle tone and bulk in Claimant's upper extremities were normal and that, aside from some reduced strength in her lower extremities, the "physical examination was normal" and there was "nothing particularly abnormal appreciated to explain her purported symptoms." (Doc. 8-3 at 44; Doc. 9-8 at 132-33). The ALJ concluded that, "despite the [C]laimant's allegation of manipulative symptoms, an EMG of the bilateral upper extremities was unremarkable," citing to Dr. De Ocampo's impression of an EMG but excluding his note that "[a] normal study does not rule out a cervical radiculopathy." (Doc. 8-3 at 44; Doc. 8-10 at 75).

This evidence neither conflicts with Dr. Caspar's opinions nor provides "clear and convincing" reasons to undermine Dr. Caspar's findings. *Orn*, 495 F.3d at 632. Importantly, Dr. Nakaji examined Claimant from "a neurosurgical structural standpoint." (Doc. 9-8 at 134). Dr. Nakaji did not find that Claimant's symptoms, from which Dr. Caspar based his opinions, were unreliable, but he instead "encouraged [White] to investigate other possible causes of her symptoms." (Doc. 9-8 at 134). Similarly, the fact that Dr. De Ocampo found an EMG to be unremarkable only rules out one possible explanation of Claimant's extensive symptoms. Thus, the assessments of Dr. Nakaji and Dr. De Ocampo are not conflicting with Dr. Caspar's medical assessment, which clearly states his assessment was based on medically determinable impairments, such as POTS, food sensitivities, asthma, allergic rhinitis, possible hereditary alpha trypasemia, as well as symptoms including, "headaches; seizures, irritable bowel with constipation/diarrhea, fatigue, dizziness, heart palpitations, tachycardia," and more. (Doc. 9-9 at 167).

Second, the ALJ cites to findings from an MRI, an orthopedic physical examination, and observations of Claimant's gait to suggest Claimant's "statements concerning the intensity, persistence and limiting effects of [Claimant's] symptoms are not entirely consistent with the medical evidence" and to contrast Dr. Caspar's assessment of Claimant's physical limitations. (Doc. 8-3 at 44). The ALJ correctly noted an orthopedist's conclusion from a lumber spine MRI and physical examination that Claimant had no spinal pathology that would explain her symptoms. (Doc. 9-9 at 96). However, the ALJ concluded from the orthopedist's recommendation of "aggressive physical therapy" that "a wheelchair [was] not medically necessary," but the ALJ provided no further explanation for this inference. (Doc. 8-3 at 44). Finally, the ALJ cited three separate observations by Claimant's physicians to support her contention that Claimant's statements concerning her physical limitations were unreliable. (Doc. 8-3 at 44). In November 2020, Dr. Saperstein observed Claimant as able to have normal casual, toe and tandem walking. (Doc. 8-10 at 16). On another occasion, August 2021, Dr. Richie observed Claimant had normal upper and lower extremity strength and a shaky gate but was able to get out of her wheelchair in good speed. (Doc. 9-9 at 13). Finally, one month later, in September 2021, Dr. Richie,

observed again that Claimant had "5/5 upper and lower extremity strength," although in the same medical note, Dr. Richie wrote that Claimant had a "wheelchair requiring gait." (Doc. 9-9 at 5). The ALJ left this fact out of her decision. (Doc. 8-3 at 44).

As was the case with the neurosurgical evidence, the evidence the ALJ points to, with regard to Claimant's physical ability, neither conflicts with nor provides "clear and convincing" reasons to undermine Dr. Caspar's medical opinions. *Orn*, 495 F.3d at 632. Dr. Caspar did not rely on any orthopedic impairments or other physical observations in assessing Claimant's ability to engage in work-related physical activities. (Doc. 9-9 at 167). Thus, the evidence the ALJ draws upon to undermine Claimant's allegations of disabling symptoms fails to demonstrate how Dr. Caspar's assessment is "inconsistent with the medical record." (Doc. 8-3 at 46).

However, even if this Court were to find the observations about examinations of Claimant's physical ability to be contradictory to Dr. Caspar's medical opinions, a treating physician's opinion may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record. *Orn*, 495 F.3d at 632. To satisfy this "substantial evidence" requirement, the ALJ must "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretation thereof, and mak[e] findings." *Garrison v. Colvin*, 759 F.3d 995, 1012 (quoting *Reddick*, 157 F.3d at 725). Here, while the ALJ did set out a detailed summary of the conflicting clinical evidence, she provided no interpretation of the evidence. The ALJ referred repeatedly to Claimant's "strength," but she drew no conclusions from this evidence with regard to Claimant's physical ability to work an 8-hour workday or to specifically contradict any of Dr. Caspar's medical opinions. (Doc. 8-3 at 44). "Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs." *Garrison*, 759 F.3d at 1012.

Finally, as discussed above, the ALJ erred in determining doctors overly relied on Claimant's subjective complaints, specifically regarding a diagnosis of POTS. Given that Dr. Caspar cited POTS as the first "medically determinable impairment" he considered in assessing Claimant's ability to do work-related physical activities, (Doc. 9-9 at 167), and

given the fact that the ALJ was not able to substantiate claims that this diagnosis was unsupported by medical evidence, the ALJ failed to provide evidence to find Dr. Caspar's assessment was "inconsistent with the medical record," as she suggested. (Doc. 8-3 at 46).

For all the reasons above, the ALJ erred in giving only "little weight" to Dr. Richie's medical assessment of Claimant. (*Id.*).

> **(iii)** **Dr. De Campo's Medical Assessment Was Not Extreme and Inconsistent with the Record and Should Not Have Been Rejected by the ALJ.**

The ALJ provided almost the same, boilerplate rationale for rejecting the medical assessment opinions of Dr. De Campo as she did for the other treating physicians. As was the case for Dr. Caspar, the ALJ wrote about Dr. De Campo that "the doctor found extreme limitations which are not consistent with the record." (Doc. 8-3 at 46). The only specific inconsistency the ALJ provided was that Dr. De Campo concluded Claimant could only use her left hand less than occasionally; yet, "the record shows a normal EMG of the upper extremities and an examination conducted near the time of the assessment noted full strength in the upper extremities." (Doc. 8-3 at 46). This Court need not dispute this evidence to find that the ALJ has failed to provide specific, legitimate reasons for discrediting Dr. De Campo's assessment. See *Orn*, 495 F.3d at 632. Like Dr. Caspar, Dr. De Campo did not base his medical assessment of Claimant's ability to do work-related, physical activities on neuromuscular abnormalities diagnosed with an EMG scan. (Doc. 8-9 at 80). Instead, Dr. De Campo identified POTS, Arnold Chiari, malformation surgery, and small fiber neuropathy as the impairments and diagnosis affecting Claimant's ability to function. (Doc. 8-9 at 80). Both Arnold Chiari syndrome and small fiber neuropathy are impairments the ALJ recognized, in her opinion, that Claimant had and that are "severe . . . impairments [that] significantly limit the ability to perform basic work activities." (Doc. 8-3 at 41). Thus, the evidence the ALJ pointed to as sufficient to find Dr. De Campo's assessments inconsistent with Claimant's medical record is not so specific and legitimate such that the ALJ may "accord little weight to the opinion of [Dr.] De Campo." (Doc. 8-3 at 46).

### B. The ALJ Erred in Determining Claimant's Residual Functional Capacity.

A residual functional capacity (RFC) finding involves a detailed assessment of how a claimant's medical impairments affect her ability to work. 20 C.F.R. § 404.1545(a)(1). In determining a claimant's RFC, the ALJ "must consider all relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins v. SSA*, 466 F.3d 880, 883 (9th Cir. 2006) (emphasis in original) (internal quotations omitted). The ALJ must consider the combined effect of multiple conditions, including those that are not severe. 20 C.F.R. § 404.1545(a)(2). A plaintiff's illnesses "must be considered in combination and must not be fragmentized in evaluating their effects." *Lester v. Chater*, 81 F.3d 821, 829 (9th Cir. 1995) (quoting *Beecher v. Heckler*, 756 F.2d 693, 694-95 (9th Cir. 1985)).

The ALJ erred in determining Claimant's RFC by failing to properly weight, and thus incorporate into the RFC, the opinions of Drs. De Ocampo, Saperstein, Casper, and Carlton. All four treating physicians concluded claimant had impairments that precluded her from working an 8-hour workday. (Doc. 9-8 at 115; Doc. 9-8 at 113; Doc. 8-9 at 80; Doc. 9-9 at 167). The ALJ determined, after failing to properly weigh the opinions of these treating physicians, that claimant had the RFC to perform the requirements of sedentary occupations such as document preparer, fundraiser II ("sedentary per the vocational expert"), and parimutuel-ticket checker. (Doc. 8-3 at 48). This determination is neither supported by the evidence nor accurate. *See* Robbins, 466 F.3d at 883. Accordingly, the ALJ erred in determining claimant's RSF.

### C. Scope of Remand

If an ALJ's decision is not supported by substantial evidence or suffers from legal error, the district court has discretion to reverse and remand either for an award of benefits or for further administrative proceedings. *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). Generally, after a finding that the administrative record does not support the

agency's action, the proper course of action is to remand to the ALJ to further develop the record. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099-100 (9th Cir. 2014). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (emphasis omitted). "Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits." *Id.*

In rare circumstances, courts may remand for an award of benefits. *Treichler*, 775 F.3d at 1099. To remand for immediate award of benefits, the Court must find:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison*, 759 F.3d at 1020 (9th Cir. 2014).

Plaintiff satisfies all three conditions of the credit-as-true rule. First, the record is fully developed. Courts have the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021. However, "precedent and the objectives of the credit-as-true rule foreclose the argument that a remand for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a 'useful purpose' under the first part of the credit-as-true test." *Id.* Here, Defendant argues that the "record raises serious doubt that Claimant was disabled" but points only to Defendant's assertion that claimant's "symptoms and statements . . . are without foundation," "contradicted by examination findings," and "relied on impairments that were not medically determinable" as evidence. (Doc. 14 at 13). These arguments do not show the record is undeveloped. Rather, it appears Defendant wants another opportunity to demonstrate that Claimant's treating physicians were wrong in their evaluations of Claimant. *See Garrison*, 759 F.3d at 1021-22 ("Allowing the Commissioner to decide the issue again would create an unfair

'heads we win; tails, let's play again' system of disability benefits adjudication." (quoting *Benecke*, 379 F.3d at 595)). For this reason, there is no need to develop the record further.

Second, as explained at length above, the ALJ failed to provide a legally sufficient reason for rejecting the medical opinion evidence of four of Claimant's treating physicians. Since the analysis supporting the same conclusion above applies here, this Court will not repeat that analysis.

Third, if the Court accepted as true the improperly discredited evidence, the ALJ would be required to find Claimant disabled on remand. All four of Claimant's treating physicians were of the opinion that claimant would be off task more than 15 percent of an 8-hour workday due to her limitations. Dr. De Ocampo reported that Claimant's limitations would cause her to be off task 16 to 20 percent of an 8-hour workday. (Doc. 8-9 at 81). Drs. Saperstein and Carlton reported Claimant's limitations would cause her to be off task greater than 21 percent of a workday. (Doc. 9-8 at 114; Doc. 9-8 at 116). Dr. Casper reported that, in addition to Claimant's impairment-related symptoms causing her to be off task greater than 21 percent of an 8-hour workday, her "pain or fatigue" would equally limit her work function. (Doc. 9-9 at 168). Vocational expert Gayle Tichauer testified in this matter at the November 10, 2021 administrative hearing. (Doc. 8-3 at 57). When the ALJ asked her whether there would be full-time work for a "hypothetical individual, [who], due to her significant medical issues–if just due to fatigue, due to allergic reactions, due to pain– . . . would [] be off-task at least 15 percent of every eight-hour workday," the vocational expert testified that, in her opinion, "that much off-task would lead to termination in any job." (Doc. 8-3 at 75-76). Thus, Plaintiff satisfies all three conditions

/ / /

/ / /

/ / /

of the credit-as-true rule. The Court, therefore, remands the Commissioner's decision for the award and calculation of benefits.

**IT IS THEREFORE ORDERED** that the final decision of the Commissioner of Social Security is **VACATED** and this case is **REMANDED** for a calculation of benefits. The Clerk shall enter judgment accordingly and shall terminate this case.

Dated this 16th day of September, 2024.

*G. Murray Snow*
G. Murray Snow
Chief United States District Judge